TYSON, Judge.
 

 *395
 
 Cedric Theodis Hobbs, Jr. ("Defendant") appeals from a jury's guilty verdicts, convicting him of first-degree murder, robbery with a dangerous weapon, attempted robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. We find no error.
 

 I. Background
 

 Rondriako Burnett was murdered on 5 November 2010 in or around Thomson, Georgia. Keon, Burnett's brother, testified that the last time he had seen his brother alive was that afternoon when he had left with Defendant, who was riding in Burnett's red Suburban SUV. The next morning, Burnett's sister received a call informing her that a
 
 *782
 
 body, later confirmed to be Burnett, had been found. Burnett's red Suburban SUV was not found with his body. A .380-caliber bullet was recovered from Burnett's body during the autopsy.
 

 On the morning of 6 November 2010, Kyle Harris and Demarshun Sanders, were working at Cumberland Pawn Shop, located in a small shopping center in Fayetteville, North Carolina. At approximately 8:45 a.m., Sanders observed Defendant and a woman sitting inside of a red SUV in the parking lot of the center. Shortly thereafter, around 9:00 a.m., Defendant entered the store to pawn a CD player. Harris told Defendant he would not accept the CD player because it was not working. Subsequently, Defendant returned to the store seeking to pawn car
 
 *396
 
 speakers. He told Harris that his SUV was broken down and he needed help. Upon hearing Defendant's reasoning, Harris agreed to accept the speakers and paid Defendant $45.00. The red SUV remained parked in the parking lot for the rest of the day and was observed there by several employees and customers.
 

 Later that evening, Harris, Derrick Blackwell, and Sean Collins were working inside the pawn shop when Defendant re-entered, carrying a backpack. Defendant was accompanied by the woman previously seen inside the red SUV, later identified as Alexis Mattocks, who was carrying a suitcase. Defendant and his companion casually browsed the store, while the employees played video games on their laptops.
 

 Defendant pulled a gun, identified as a silver-chromed Lorcin .380 caliber handgun, and pointed it at all three employees. Defendant told the employees to empty their pockets, demanded their phones, wallets, and keys, and for the cash register be emptied.
 

 To fulfill Defendant's request, Harris began walking toward the cash register. Defendant pulled the trigger and shot Harris in the upper chest. Defendant then walked behind the counter, pointed the gun at Blackwell, and instructed him to empty the cash register. After taking the money inside the register, Defendant directed his attention to Collins, who was instructed to empty his pockets. Collins complied, and threw the contents of his pockets on the ground towards Defendant. Defendant took money off the floor and proceeded to grab the wounded Harris' car keys from his belt loop.
 

 Defendant exited the store and moved some items from the red SUV, later confirmed to be Burnett's stolen Suburban, and drove off in Harris' silver colored Saturn Ion. When first responders arrived on the scene, Harris was unresponsive. Harris died from the injuries resulting from the gunshot wound.
 

 On the night of 6 November 2010, Washington, D.C. Police Officer Jerry Reyes observed a Saturn Ion bearing a North Carolina license plate. Officer Reyes checked the plate, learned the vehicle was stolen, and began pursuit. When back-up officers arrived, Officer Reyes executed a traffic stop. There were three people inside the car: Defendant, who was driving, Mattox, and their young child. Officer Reyes pulled Defendant out of the car, handcuffed and arrested him.
 

 The Washington, D.C. Police learned an occupant of the stolen Saturn was a "person of interest" in connection with a robbery/homicide in Fayetteville, North Carolina, and contacted the Fayetteville Police
 
 *397
 
 Department. After verifying Defendant was the "person of interest" and seeing blood located on Defendant's shoes, Washington D.C. Police obtained a search warrant for the Saturn. The subsequent search recovered a .380-caliber Lorcin handgun. The bullets removed from the bodies of Rondriako Burnett and Kyle Harris matched with a test shot later fired from the recovered Lorcin .380-caliber handgun.
 

 The Fayetteville Police Department obtained North Carolina warrants, and Detective Sondergaard traveled to Washington D.C. to interview Defendant. Defendant stated his purpose for the robbery was to get "[m]oney and guns" and he had fired his weapon to "scare" the employees of the pawn shop, but he "wasn't trying to shoot" Harris.
 

 On 4 August 2014, Defendant was indicted for first-degree murder, first-degree kidnapping, two counts of second-degree kidnapping, two counts of robbery with a dangerous weapon, two counts of attempted robbery
 
 *783
 
 with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. Defendant gave notice to assert the defenses of mental infirmity, diminished capacity, and automatism.
 

 A capital first-degree murder trial and for the other related charges commenced against Defendant. At the close of the State's evidence, Defendant moved to dismiss all charges. The court dismissed the three kidnapping charges, but denied Defendant's motion to dismiss any of the remaining charges.
 

 Defendant did not testify at trial, but presented evidence of his background though the testimony of various family members, and evidence of his mental health through expert witnesses. The testimony of his family members stated Defendant had survived a troubled childhood. He had lived in bad neighborhoods where drive-by shootings were frequent, and drug use and violence were present. His father abused alcohol and drugs during Defendant's childhood and adolescence. His mother abused Defendant by spanking him repeatedly. Defendant's mother was described as "different" and "real strange" by Defendant's aunts.
 

 Abandoned by his parents, Defendant went to live with his aunt and uncle, who suffered through many evictions and also lived in crime-ridden neighborhoods. Even though Defendant was described as a bright student, his behavior and performance began to change drastically in high school. In 1997, Defendant was arrested for armed robbery and was placed into a drug treatment program. Defendant lost interest in the marching band, his grades began to drop, and his absences from school increased. His probation was revoked and he served time in
 
 *398
 
 prison. After meeting Alexis Mattocks, and after the birth of their daughter, Defendant was described as beginning to turn his life around.
 

 Defendant returned to Georgia in August 2010 after residing in Washington, D.C. for several years, when his family was evicted from their home. A couple of months after moving back to Georgia, Defendant relapsed into drug use and bought drugs from Rondriako Burnett.
 

 Dr. Ginger Calloway, a psychologist, testified regarding Defendant's and his parents' prior mental health diagnoses and Defendant's substance abuse. Dr. Calloway asserted Defendant's background and experiences were all influential on Defendant's actions at the time of the murders.
 

 Defendant told Dr. Calloway he had routinely carried a gun when he lived in D.C. because of the violence, began committing robberies in 1997 to obtain money, and he had used and sold drugs. He also stated to Dr. Calloway he had not intended to kill Harris.
 

 Dr. George Corvin, a psychiatrist, testified about his diagnoses of Defendant, which included persistent depressive disorder, post-traumatic stress disorder, multiple substance abuse disorder, and characteristics of borderline personality disorder and paranoid personality disorder. Dr. Corvin opined that Defendant's mental abilities were affected by mental illness at the time of the offenses.
 

 Defendant told Dr. Corvin he had relapsed and began using cocaine again approximately two weeks before the offenses. Defendant also told Dr. Corvin that the day before he shot Burnett, he and Burnett had engaged in an altercation over money. Burnett had shot a gun into the air, which startled Defendant, upset Mattocks, and made their baby cry. Defendant shot Burnett the next day and stated he was mad at Burnett and wanted to kill him.
 

 Dr. Corvin testified that he understood Defendant had taken Mattocks and their baby out of Georgia, because Defendant's family had been talking about taking the baby away from them. They hid Burnett's SUV until after dark, then drove to Fayetteville, North Carolina, to the Cumberland Pawn Shop.
 

 Once there, the vehicle would not start, and they came up with a plan to rob the pawn shop. They bought duct tape and planned to have Defendant hold the gun. Mattocks was to restrain the employees with the duct tape, take money and guns from the pawn shop, steal Harris' Saturn, and then they would drive to Washington, D.C. to sell the guns.
 

 *784
 

 *399
 
 Dr. Corvin stated Defendant had told him that he did not intend to hurt anyone during the robbery, and displayed remorse for killing Harris, but not for killing Burnett, who Defendant thought was a "very bad person." Dr. Corvin opined Defendant's ability to think, reason, and make judgments was compromised at the time of the robbery. Dr. Corvin stated while Defendant did plan and intended the robbery, he personally doubted Defendant had intended to kill Harris.
 

 Based upon the evidence presented, defense counsel made three written requests for jury instructions at the charge conference. Defense counsel proposed instructions on: (1) first-degree murder with premeditation and deliberation; (2) lack of mental capacity; and (3) deliberation. The trial court denied the requests for deliberation and first-degree murder with premeditation and deliberation. The court indicated that these proposed instructions were covered in substance in the pattern jury instructions, but granted defense counsel's request for a proposed instruction on lack of mental capacity.
 

 The jury found Defendant guilty of all charges, including first-degree murder on both the basis of premeditation and deliberation and under the felony murder rule. The jury deadlocked 11-to-1 in favor of a capital sentence. The trial judge sentenced Defendant to life imprisonment without parole for the first-degree murder conviction, consolidated with one of the attempted robbery with a dangerous weapon convictions, followed by consecutive sentences on each of the remaining convictions. Defendant filed timely notice of appeal.
 

 II. Jurisdiction
 

 An appeal of right lies with this court from a final judgment of the superior court pursuant to N.C. Gen. Stat. §§ 7A-27(b)(1) and 15A-1444(a) (2017).
 

 III. Issues
 

 Defendant argues the trial court erred when it denied defense counsel's proffered jury instructions and denied Defendant's first three
 
 Batson
 
 challenges.
 

 IV. Jury Instructions
 

 A. Standard of Review
 

 This Court has recognized "the proper standard of review depends upon the nature of a defendant's request for a jury instruction."
 
 State v. Edwards
 
 ,
 
 239 N.C. App. 391
 
 , 392,
 
 768 S.E.2d 619
 
 , 620 (2015). Defendant
 
 *400
 
 argues the standard of review for this issue is
 
 de novo
 
 , and cites
 
 State v. Osorio
 
 ,
 
 196 N.C. App. 458
 
 , 466,
 
 675 S.E.2d 144
 
 , 149 (2009).
 

 The issue in
 
 Osorio
 
 was whether sufficient evidence existed to support a jury instruction on acting in concert.
 

 Id.
 

 "Whether evidence is sufficient to warrant an instruction ... is a question of law[.]"
 
 State v. Cruz
 
 ,
 
 203 N.C. App. 230
 
 , 242,
 
 691 S.E.2d 47
 
 , 54 (2010). We review questions of law
 
 de novo
 
 .
 
 Edwards
 
 ,
 
 239 N.C. App. at 393
 
 ,
 
 768 S.E.2d at 621
 
 (citation omitted).
 

 Where the issue is not a question of law or reviewed
 
 de novo
 
 , the appropriate standard of review is for an abuse of discretion.
 
 State v. Lewis
 
 ,
 
 346 N.C. 141
 
 , 145,
 
 484 S.E.2d 379
 
 , 381 (1997) ("[w]hether the trial court instructs using the exact language requested by counsel is a matter within its discretion and will not be overturned absent a showing of abuse of discretion.") (quoting
 
 State v. Herring
 
 ,
 
 322 N.C. 733
 
 , 742,
 
 370 S.E.2d 363
 
 , 369 (1988) );
 
 State v. Shepherd
 
 ,
 
 156 N.C. App. 603
 
 , 607,
 
 577 S.E.2d 341
 
 , 344 (2003) ("the choice of instructions given to a jury 'is a matter within the trial court's discretion and will not be overturned absent a showing of abuse of discretion.' ") (quoting
 
 State v. Nicholson
 
 ,
 
 355 N.C. 1
 
 , 66,
 
 558 S.E.2d 109
 
 , 152,
 
 cert. denied
 
 ,
 
 537 U.S. 845
 
 ,
 
 123 S.Ct. 178
 
 ,
 
 154 L.Ed. 2d 71
 
 (2002) ).
 

 As the issue here involves the judge's choice in the instructions given to the jury, we review the trial court's ruling for an abuse of discretion.
 
 See
 

 Lewis
 
 ,
 
 346 N.C. at 145
 
 ,
 
 484 S.E.2d at 381
 
 .
 

 B. Abuse of Discretion
 

 "This Court has consistently held that a trial court is not required to give a [defendant's] requested instruction verbatim. Rather, when the [defendant's] request is correct in law and supported by the evidence, the
 
 *785
 
 court must give the instruction in substance."
 
 State v. Wallace
 
 ,
 
 351 N.C. 481
 
 , 525,
 
 528 S.E.2d 326
 
 , 353 (2000) (citation and internal quotation marks omitted). This rule applies even when the requested instructions are based on language from opinions of the Supreme Court of North Carolina.
 
 State v. Harden
 
 ,
 
 344 N.C. 542
 
 , 555,
 
 476 S.E.2d 658
 
 , 664 (1996),
 
 cert. denied
 
 ,
 
 520 U.S. 1147
 
 ,
 
 117 S.Ct. 1321
 
 ,
 
 137 L.Ed. 2d 483
 
 (1997).
 

 The additional jury instructions defense counsel proffered all relate to the mental and/or emotional condition of Defendant at the time of the murder and whether Defendant had the mental capacity to consider the consequences of his actions. Such language is present in the Pattern Jury Instructions. Defendant has failed to show the trial court abused its discretion in denying Defendant's additional language, the substance of which
 
 *401
 
 was included in the jury instructions the trial court gave.
 
 See
 

 Wallace
 
 ,
 
 351 N.C. at 525
 
 ,
 
 528 S.E.2d at
 
 353 ;
 
 see also
 

 State v. Jones
 
 ,
 
 342 N.C. 628
 
 , 632-33,
 
 467 S.E.2d 233
 
 , 235 (1996).
 

 Further, the trial court allowed and gave Defendant's proposed instruction on lack of mental capacity. This instruction informed the jury that "[i]f, as a result of post-traumatic stress disorder, persistent depressive disorder, or some other mental infirmity, the defendant did not have the specific intent to kill, formed after premeditation and deliberation, he is not guilty of first degree murder." The jury was clearly instructed concerning their ability to consider Defendant's mental illnesses and condition as part of their deliberation.
 

 Finally, Defendant was found guilty of first-degree murder based upon premeditation and deliberation and under the felony murder rule. Presuming,
 
 arguendo
 
 , the trial court erred by denying Defendant's requested instructions, such error would not be prejudicial.
 
 See
 

 State v. Farmer
 
 ,
 
 333 N.C. 172
 
 , 194,
 
 424 S.E.2d 120
 
 , 133 (1993) (finding that where the defendant was convicted of first-degree murder under both the felony murder rule and the theory of premeditation and deliberation, "it would not have been reversible error for the trial court to have failed to give any instructions concerning premeditation and deliberation.").
 

 V.
 
 Batson
 
 Challenges
 

 Defendant challenges the State's exclusion of potential jurors, who are the same race as Defendant, by the State's use of peremptory challenges under
 
 Batson v. Kentucky
 
 ,
 
 476 U.S. 79
 
 ,
 
 106 S.Ct. 1712
 
 ,
 
 90 L.Ed. 2d 69
 
 (1986).
 

 A. Standard of Review
 

 Defendant cites
 
 Piedmont Triad Regional Water Authority v. Sumner Hills, Inc.
 
 ,
 
 353 N.C. 343
 
 , 348,
 
 543 S.E.2d 844
 
 , 848 (2001), to support his assertion that this issue should be reviewed
 
 de novo
 
 , as it presents a constitutional question. However, in ruling on criminal cases involving
 
 Batson
 
 challenges, the Supreme Court of North Carolina has upheld "the trial court's determination unless [the Court was] convinced it is clearly erroneous."
 
 State v. Golphin
 
 ,
 
 352 N.C. 364
 
 , 427,
 
 533 S.E.2d 168
 
 , 211 (2000),
 
 cert. denied
 
 ,
 
 532 U.S. 931
 
 ,
 
 121 S.Ct. 1379
 
 , 1380,
 
 149 L.Ed. 2d 305
 
 (2001) (citing
 
 State v. Kandies
 
 ,
 
 342 N.C. 419
 
 , 434-35,
 
 467 S.E.2d 67
 
 , 75,
 
 cert. denied
 
 ,
 
 519 U.S. 894
 
 ,
 
 117 S.Ct. 237
 
 ,
 
 136 L.Ed. 2d 167
 
 (1996) );
 
 State v. Lawrence
 
 ,
 
 352 N.C. 1
 
 , 14,
 
 530 S.E.2d 807
 
 , 816 (2000) (" 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous' ") (quoting
 
 State v. Thomas
 
 ,
 
 329 N.C. 423
 
 , 433,
 
 407 S.E.2d 141
 
 , 148 (1991) ). "When the trial court explicitly rules that a defendant
 
 *402
 
 failed to make out a
 
 prima facie
 
 case, review by this Court is limited to whether the trial court's finding was error."
 
 Golphin
 
 , 352 N.C. at 426,
 
 533 S.E.2d at 211
 
 .
 

 B. Three-Prong
 
 Batson
 
 Test
 

 "In
 
 Batson
 
 the United States Supreme Court set out a three-pronged test to determine whether a prosecutor impermissibly excluded prospective jurors on the basis of their race."
 
 State v. Bonnett
 
 ,
 
 348 N.C. 417
 
 , 433,
 
 502 S.E.2d 563
 
 , 574 (1998) (citing
 
 Hernandez v. New York
 
 ,
 
 500 U.S. 352
 
 , 358-59,
 
 111 S.Ct. 1859
 
 ,
 
 114 L.Ed. 2d 395
 
 , 405 (1991) ),
 
 cert. denied
 
 ,
 
 525 U.S. 1124
 
 ,
 
 119 S.Ct. 909
 
 ,
 
 142 L.Ed. 2d 907
 
 (1999).
 

 *786
 
 "First, the defendant must make a
 
 prima facie
 
 showing that the state exercised a peremptory challenge on the basis of race."
 
 State v. Fair
 
 ,
 
 354 N.C. 131
 
 , 140,
 
 557 S.E.2d 500
 
 , 509 (2001) (citing
 
 Lawrence
 
 , 352 N.C. at 14,
 
 530 S.E.2d at
 
 815 ). This showing is "based on all relevant circumstances, such as defendant's race, the victim's race, the race of key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, a pattern of strikes against minorities, or the State's acceptance rate of prospective minority jurors."
 
 State v. White
 
 ,
 
 349 N.C. 535
 
 , 548,
 
 508 S.E.2d 253
 
 , 262 (1998) (citation omitted). Numerical analysis of the accepted and dismissed jurors of a particular race is not dispositive proof of discrimination, but it "can be useful in helping us and the trial court determine whether a
 
 prima facie
 
 case of discrimination has been established."
 
 State v. Barden
 
 ,
 
 356 N.C. 316
 
 , 344,
 
 572 S.E.2d 108
 
 , 127 (2002).
 

 "The first step of the
 
 Batson
 
 analysis is not intended to be a high hurdle for defendants to cross. Rather, the showing need only be sufficient to shift the burden to the State to articulate race-neutral reasons for its peremptory challenge."
 
 State v.
 

 Wiggins
 
 ,
 
 159 N.C. App. 252
 
 , 262,
 
 584 S.E.2d 303
 
 , 311-12 (2003) (citation and internal quotation marks omitted),
 
 cert. denied
 
 ,
 
 541 U.S. 910
 
 ,
 
 124 S.Ct. 1617
 
 ,
 
 158 L.Ed. 2d 256
 
 (2004).
 

 If a
 
 prima facie
 
 showing is made by a defendant,
 

 the burden shifts to the State to articulate a race-neutral reason for striking the particular juror. The State's explanation must be clear and reasonably specific, but does not have to rise to the level of justifying a challenge for cause. Moreover, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.
 

 *403
 

 Golphin
 
 , 352 N.C. at 426,
 
 533 S.E.2d at 211
 
 (citations and internal quotation marks omitted). A defendant may "submit evidence to show that the state's proffered reason is merely a pretext for discrimination."
 
 Fair
 
 ,
 
 354 N.C. at 140
 
 ,
 
 557 S.E.2d at 509
 
 .
 

 Finally,
 

 the trial court must decide whether the defendant has proven purposeful discrimination. This involves weighing various factors such as susceptibility of the particular case to racial discrimination, whether the State used all of its peremptory challenges, the race of witnesses in the case, questions and statements by the prosecutor during jury selection which tend to support or refute an inference of discrimination, and whether the State has accepted any African-American jurors.
 

 Id.
 

 (citations and internal quotation marks omitted).
 

 Upon review, this Court considers several non-exclusive factors:
 

 (1) the characteristic in question of the defendant, the victim and any key witnesses;
 

 (2) questions and comments made by the prosecutor during jury selection which tend to support or contradict an inference of discrimination based upon the characteristic in question;
 

 (3) the frequent exercise of peremptory challenges to prospective jurors with the characteristic in question that tends to establish a pattern, or the use of a disproportionate number of peremptory challenges against venire members with the characteristic in question;
 

 (4) whether the State exercised all of its peremptory challenges; and,
 

 (5) the ultimate makeup of the jury in light of the characteristic in question.
 

 Wiggins
 
 ,
 
 159 N.C. App. at 263
 
 ,
 
 584 S.E.2d at 312
 
 (citations omitted).
 

 C. Trial Court's Determination
 

 During
 
 voir dire
 
 , defense counsel raised four challenges to the jury venire under
 
 Batson
 
 , and argued the State had exercised peremptory challenges to excuse prospective jurors based upon their race. Three of
 
 *404
 
 these challenges are argued on appeal: prospective jurors Robert Layden and Brian Humphrey, prospective juror Curtis Landry, and prospective juror William McNeill. By failing to raise and argue the fourth challenge on appeal, Defendant has abandoned his assertion of error to this challenge.
 
 *787
 
 N.C.R. App. P. 28(a). We address each remaining challenge in turn.
 

 1. Jurors Layden and Humphrey
 

 For the first challenge, defense counsel asserted the State had used six out of their eight peremptory challenges to excuse black jurors, even though the responses elicited from the excused black potential jurors were allegedly similar in substance to white jurors who had remained in the pool.
 

 The trial court found Defendant had failed to make a
 
 prima facie
 
 showing. However, the trial court improperly requested the State to articulate for the record its reasons for challenging these prospective jurors. After hearing arguments, the trial court reaffirmed its finding that Defendant had failed to make a
 
 prima facie
 
 showing.
 

 Defendant argues that the trial court's ruling became moot once the State gave its reasons for its peremptory challenges. It is true that
 

 [i]f the prosecutor volunteers his reasons for the peremptory challenges in question before the trial court rules whether the defendant has made a
 
 prima facie
 
 showing or if the trial court requires the prosecutor to give his reasons without ruling on the question of a
 
 prima facie
 
 showing, the question of whether the defendant has made a
 
 prima facie
 
 showing becomes moot[.]
 

 State v. Williams
 
 ,
 
 343 N.C. 345
 
 , 359,
 
 471 S.E.2d 379
 
 , 386 (1996). However, if, as here, the trial court rules the defendant did not make a
 
 prima facie
 
 showing, and merely asks for the State's reasoning underlying its decision to challenge "for the record," the issue is not moot.
 
 Id.
 
 at 359,
 
 471 S.E.2d at 386-87
 
 . On this challenge, "our review is limited to whether the trial court erred in finding that defendant failed to make a
 
 prima facie
 
 showing."
 
 Id.
 
 at 359,
 
 471 S.E.2d at
 
 387 ;
 
 State v. Smith
 
 ,
 
 351 N.C. 251
 
 , 262,
 
 524 S.E.2d 28
 
 , 37 (2000) ("Where the trial court rules that a defendant has failed to make a
 
 prima facie
 
 showing, our review is limited to whether the trial court erred in finding that defendant failed to make a
 
 prima facie
 
 showing, even if the State offers reasons for its exercise of the peremptory challenges.").
 

 In
 
 State v. Smith
 
 , the defendant made a
 
 Batson
 
 challenge after the State had exercised six of its eight peremptory challenges to excuse
 
 *405
 
 black potential jurors. 351 N.C. at 262,
 
 524 S.E.2d at 37
 
 . As here, the defendant in
 
 Smith
 
 did not assert his first
 
 Batson
 
 challenge until after the State had exercised its eighth peremptory strike.
 

 Id.
 

 351 N.C. at 263,
 
 524 S.E.2d at 37
 
 . Where a defendant has not made any previous, specific
 
 Batson
 
 challenge, the trial court has "no obligation to inquire into the reasons for striking those [previously excused] jurors."
 

 Id.
 

 "Although not dispositive, one factor tending to refute an allegation of peremptory challenges being exercised on the basis of race is the acceptance rate of black jurors by the prosecution."
 

 Id.
 

 (citation omitted). At the time of Defendant's challenge, eleven black potential jurors were examined by the State, and the State passed five, one of whom was later dismissed by the trial court for cause. Defendant used two of five peremptory challenges to strike black jurors.
 

 At the time of Defendant's first
 
 Batson
 
 challenge, the jury consisted of two white males, two black males, and two white females. If Defendant had not used his two peremptory strikes, the composition of the jury at the time of his first challenge would have been four black jurors, three males and one female, and four white jurors.
 

 As to the other factors, Defendant is black, and while the murder victim was white, at least one of the other victims of the robbery was black. Further, key witnesses relating to the homicide of Burnett in Georgia and Defendant's arrest in Washington, D.C. were black. After reviewing the record, "we also conclude that the prosecutor did not make any racially motivated comments, nor did he ask racially motivated questions of the black prospective jurors."
 

 Id.
 

 Considering all the relevant factors, we conclude the trial court did not err in finding Defendant had failed to establish a
 
 prima facie
 
 showing for prospective jurors Layden and Humphrey.
 
 See
 

 *788
 

 White
 
 ,
 
 349 N.C. at 548
 
 ,
 
 508 S.E.2d at 262
 
 . Defendant's arguments are overruled.
 

 2. Juror Landry
 

 Defendant raised his second
 
 Batson
 
 challenge after the State had exercised its ninth peremptory challenge. Defense counsel indicated that they "ha[d] nothing to add" and renewed what they had "earlier said" in regards to the "general opposition to why [they] needed to make a
 
 prima facie
 
 case." The trial court noted the State had used seven out of their nine peremptory challenges to excuse black prospective jurors and, considering the previous facts cited, found Defendant had made a
 
 prima facie
 
 showing and convened a hearing. After the hearing, Defendant's
 
 Batson
 
 challenge was denied.
 

 *406
 
 When a trial court finds a defendant has made a
 
 prima facie
 
 showing, the first prong of the analysis is satisfied.
 
 Wiggins
 
 ,
 
 159 N.C. App. at 264
 
 ,
 
 584 S.E.2d at 312
 
 (citation omitted). We consider the State's proffered reasoning for striking Landry, and whether the trial court properly found these reasons were not pretextual.
 

 Id.
 

 The prosecutor asserted potential juror Landry was excused because: (1) he believed drugs and alcohol can make people do things they did not want to do; (2) he had mentored individuals with substance abuse issues in his church; (3) his uncle had died in prison while serving two life sentences; (4) he had stated he believed a life sentence was taking a life; (5) he had left several questions on the juror questionnaire unanswered; (6) he had given some "perplexing" responses to questions; (7) he had allegedly walked out of court once singing "the sun will come out tomorrow"; (8) he had nodded affirmatively when another juror, who was excused for cause, mentioned her religious belief against the death penalty; (9) he had previously been in a gang and had heard Defendant was in a gang; (10) he had failed to appear in court on previous occasions; and, (11) he had stated he would hold it against the State if it did not present all the evidence.
 

 Defendant has failed to show any error in the trial court's conclusion that the State's reasons for dismissing Landry were race-neutral.
 
 See
 

 State v. Bell
 
 ,
 
 359 N.C. 1
 
 , 13-16,
 
 603 S.E.2d 93
 
 , 103-05 (2004) (valid and race-neutral reasons for excusing a juror include: views on the death penalty, concern a juror might be unduly sympathetic to the defendant, work in prison ministry, and work with Alcoholics Anonymous);
 
 see also
 

 State v. Robinson
 
 ,
 
 336 N.C. 78
 
 , 95,
 
 443 S.E.2d 306
 
 , 313 (1994) (not answering questions in a direct manner and confusing the meaning of questions asked were valid and race-neutral reasons to excuse jurors).
 

 Defendant argues there were similar concerns with several of the white jurors who the State did not strike but passed on to Defendant, and asserts the State did not properly follow up with several of Landry's responses to see if they would be a problem. However, Defendant does not specify which white jurors had given similar answers and were not excused. After a close reading of the record and transcript, we do not find this argument to have merit. While some jurors had one factor in common with Landry, none presented the range and multiplicity of issues the State stated for challenging Landry.
 

 The combination of factors present with Landry's answers and demeanor led to his dismissal. Defendant cannot show disparate treatment "because the same combination of factors was not present" in
 
 *407
 
 the white jurors whom the State passed.
 
 Bell
 
 ,
 
 359 N.C. at 14
 
 ,
 
 603 S.E.2d at 104
 
 . Defendant fails to show any error in the trial court's denial of Defendant's second
 
 Batson
 
 challenge of prospective juror Landry.
 

 3. Juror McNeill
 

 Defendant's third
 
 Batson
 
 challenge was asserted after the State had exercised its eleventh peremptory challenge. Defense counsel reiterated the same arguments previously asserted and reminded the court that Defendant had successfully established a
 
 prima facie
 
 case based upon those grounds. After a hearing, the trial court denied this
 
 Batson
 
 challenge.
 

 At the time of the third challenge, the State had used eight out of eleven peremptory challenges to excuse black prospective jurors, and had passed on eight black prospective jurors to Defendant. Two of those
 
 *789
 
 black jurors were seated on the jury panel, one had been dismissed for cause, and five of those prospective black jurors were struck by Defendant's peremptory challenges.
 

 In support of its neutral justification, the State stated McNeill was excused after he hesitated to reply when asked if he could vote to impose the death penalty, and then stated he preferred life in prison over the death penalty. Further, he disclosed he had family members with substance abuse issues, a sister with apparent anxiety, and as a pastor, he had often counseled individuals with substance abuse issues.
 

 As with the previous venireman, we conclude the State presented valid, race-neutral reasons for excusing prospective juror McNeill.
 
 See
 

 Robinson
 
 ,
 
 336 N.C. at 97
 
 ,
 
 443 S.E.2d at 314
 
 (finding a dismissal of a juror who stated a preference of life imprisonment over the death penalty was "clear and reasonable");
 
 see also
 

 State v. Maness
 
 ,
 
 363 N.C. 261
 
 , 272,
 
 677 S.E.2d 796
 
 , 804 (2009) (excusing a juror who had mental illness and who had worked with substance abusers, causing the State to fear she would "overly identify with defense evidence" was valid and race-neutral).
 

 Defendant argues McNeill's involvement with family and parishioner substance abuse had occurred many years ago and he did not presently know anyone with such issues. He further argues McNeill did state he could consider the death penalty and that the State had passed white jurors who had issues with anxiety. After a close reading of the record and transcript, we again do not find these arguments persuasive. As with the previous venireman, it is the aggregate of race-neutral factors identified by the State that led to McNeill's challenge and dismissal. Defendant has failed to show disparate treatment in this
 
 Batson
 
 challenge.
 
 See
 

 Bell
 
 ,
 
 359 N.C. at 14
 
 ,
 
 603 S.E.2d at 104
 
 .
 

 *408
 

 VI. Conclusion
 

 The trial court did not abuse its discretion in denying two of Defendant's three proposed jury instructions. The jury was provided the proposed instructions in substance with the pattern jury instructions the trial court gave.
 
 See
 

 Wallace
 
 , 351 N.C. at 525,
 
 528 S.E.2d at 353
 
 . Further, the trial court did instruct the jury on Defendant's proposed instruction on lack of mental capacity, fully alerting the jury to their ability to consider Defendant's asserted mental illness as part of the required intent for first-degree murder. Finally, Defendant failed to show any reversible error, where he was convicted of first-degree murder under both the theory of premeditation and deliberation
 
 and
 
 under the felony murder rule.
 
 See
 

 Farmer
 
 ,
 
 333 N.C. at 194
 
 ,
 
 424 S.E.2d at 133
 
 .
 

 After reviewing all the "relevant circumstances," the trial court did not err in concluding Defendant had failed to make a
 
 prima facie
 
 showing in his first
 
 Batson
 
 challenge.
 
 See
 

 White
 
 ,
 
 349 N.C. at 548
 
 ,
 
 508 S.E.2d at 262
 
 . It is well established that a disproportionate number of State's peremptory challenges to dismiss prospective jurors of a particular race is not dispositive of discrimination, but is one factor for the Court to consider.
 
 Barden
 
 ,
 
 356 N.C. at 344
 
 ,
 
 572 S.E.2d at 127
 
 ("We emphasize that a numerical analysis of the type employed here is not necessarily dispositive. However, such an analysis can be useful in helping us and the trial court determine whether a
 
 prima facie
 
 case of discrimination has been established.");
 
 Smith
 
 , 351 N.C. at 263,
 
 524 S.E.2d at
 
 37 ;
 
 Wiggins
 
 ,
 
 159 N.C. App. at 265
 
 ,
 
 584 S.E.2d at 313
 
 .
 

 An analysis of the peremptory challenges in this case goes against Defendant's argument. While the State, at the time of the last
 
 Batson
 
 challenge, had exercised over seventy percent of its peremptory challenges for black jurors, the State peremptorily challenged eight black prospective jurors and passed eight other black prospective jurors to Defendant. One prospective black juror passed by the State was struck by the trial court for cause. Defendant ultimately determined only two black jurors were seated on the panel at the time of the third challenge, as he struck five black potential jurors the State had passed to be seated.
 

 Regarding the other two
 
 Batson
 
 challenges, the State presented valid, race-neutral reasons for challenging the two jurors dismissed. Defendant failed to show any purposeful discrimination.
 

 *790
 

 Fair
 
 ,
 
 354 N.C. at 140
 
 ,
 
 557 S.E.2d at 509
 
 . After weighing all the factors considered by the trial court, Defendant has also failed to show the trial court's rulings were clearly erroneous.
 
 Golphin
 
 , 352 N.C. at 427,
 
 533 S.E.2d at 211
 
 .
 

 *409
 
 Defendant received a fair trial, free from prejudicial errors. Defendant's arguments are overruled. We find no error in the jury's verdicts or the judgments entered thereon.
 
 It is so ordered.
 

 NO ERROR.
 

 Judges DIETZ and BERGER concur.