IN THE SUPREME COURT OF NORTH CAROLINA

No. 263PA18

Filed 1 May 2020

STATE OF NORTH CAROLINA

v.

CEDRIC THEODIS HOBBS JR.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 260 N.C. App. 394, 817 S.E.2d 779 (2018), finding no error after appeal from judgments entered on 18 December 2014 by Judge Robert F. Floyd in Superior Court, Cumberland County. Heard in the Supreme Court on 3 February 2020.

*Joshua H. Stein, Attorney General, by Amy Kunstling Irene, Special Deputy Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Sterling Rozear, Assistant Appellate Defender, for defendant-appellant.*

*Donald H. Beskind, Robert S. Chang, and Taki V. Flevaris for Fred T. Korematsu Center for Law and Equality, amicus curiae.*

*David Weiss, James E. Coleman Jr., and Elizabeth Hambourger for Coalition of State and National Criminal Justice and Civil Rights Advocates, amici curiae.*

EARLS, Justice.

Cedric Theodis Hobbs Jr. is an African-American male who was indicted for the murder of a young white man and for a further eight additional felonies including

armed robbery and kidnapping against three other white victims. Before trial, Mr. Hobbs filed a motion pursuant to the Racial Justice Act which included information about prior capital cases in Cumberland County. During jury selection in his capital trial, Mr. Hobbs made a number of objections arguing that the State was exercising its peremptory challenges in a racially discriminatory manner. He pursues two of these objections in arguments before this Court. At the time of his final objection, the State had used eight out of eleven of its peremptory challenges against black jurors. While it had accepted eight and excused eight black jurors at that time, the State had accepted twenty and excused two white jurors.

On 12 December 2014, Mr. Hobbs was found guilty of one count of first-degree murder by malice, premeditation and deliberation, and also under the felony murder rule; two counts of robbery with a dangerous weapon; two counts of attempted robbery with a dangerous weapon; and one count of felonious conspiracy to commit robbery with a dangerous weapon. He was sentenced to life imprisonment without parole for the first-degree murder conviction and one count of attempted robbery with a dangerous weapon, as well as three consecutive sentences of 73 to 97 months for each of the two convictions for robbery with a dangerous weapon and for the other attempted robbery with a dangerous weapon conviction. Mr. Hobbs was also sentenced to 29 to 44 months for conspiracy to commit robbery with a dangerous weapon.

Mr. Hobbs appealed to the Court of Appeals. On appeal, he argued that the trial court should have accepted his proffered jury instruction concerning his mental capacity to consider the consequences of his actions and should have granted three objections that he made under the decision of the Supreme Court of the United States in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986), which prohibits the use of race-based peremptory challenges during jury selection. In a unanimous opinion, the Court of Appeals rejected Mr. Hobbs's arguments, concluding that Mr. Hobbs received a fair trial, free from prejudicial error. *State v. Hobbs*, 260 N.C. App. 394, 409, 817 S.E.2d 779, 790 (2018). Mr. Hobbs then sought discretionary review in this Court, arguing that the Court of Appeals erred in its analysis of his *Batson* claims with respect to three jurors. We agree. As to the first two jurors, the Court of Appeals rejected Mr. Hobbs's argument "that the trial court's ruling [that Hobbs had failed to establish a prima facie case of discrimination] became moot." *Hobbs*, 260 N.C. App. at 404, 817 S.E.2d at 787. This was error. As to the third juror, the Court of Appeals affirmed the trial court's determination that Mr. Hobbs had not met his ultimate burden of showing that the strike was motivated by race. This, also, was error. As to all three jurors, we remand for reconsideration of the third stage of the *Batson* analysis, namely whether Mr. Hobbs proved purposeful discrimination in each case.

## Background

The evidence at trial tended to show that Mr. Hobbs robbed the Cumberland Pawn and Loan Shop on 6 November 2010. Kyle Harris, Derrick Blackwell, and Sean

Collins were all working and present at the pawn shop on that date. During the robbery, Mr. Hobbs shot Kyle Harris, a nineteen-year-old college student, in the chest, killing him. At trial, Mr. Hobbs presented a defense of diminished capacity, arguing that his troubled upbringing, severe childhood traumas, poor mental health, and substance abuse affected his mental ability at the time of the offenses. *Hobbs*, 260 N.C. App. at 396–99, 817 S.E.2d at 783–84.

The jury pool for Mr. Hobbs's capital trial was divided into panels of twelve, which were called up in subsequent rounds of jury selection as the parties progressed through voir dire. Mr. Hobbs made his first *Batson* objection during the third round of jury selection after the State excused jurors Brian Humphrey and Robert Layden, both of whom were black. At the time of those strikes, the State had issued peremptory challenges against eight jurors, two of whom were nonblack and six of whom were black. Of the thirty-one qualified jurors tendered to the State, the State had excused two out of twenty white jurors (10%) and six out of eleven black jurors (54.5%).

Mr. Hobbs argued that the facts above, along with the fact that he was a black male accused of robbing multiple white victims and murdering one white victim, the similarities between the answers provided by the excused black jurors and the accepted nonblack jurors, and the history of racial discrimination in jury selection in the county where Mr. Hobbs was being prosecuted all worked together to establish a prima facie case that the State had impermissibly based its peremptory challenges

on the race of the jurors. The trial court determined that Mr. Hobbs had not made out a prima facie case of discrimination. However, the trial court asked the State, for purposes of the record, to explain the State's use of peremptory challenges against the black jurors it had excused up to that point. After the State offered its reasons, the trial court gave Mr. Hobbs an opportunity to reply and argue that the State's reasons were pretextual. The trial court described this as "a full hearing on the defendant's *Batson* claim." Following the hearing, the trial court ruled that the State's peremptory challenges were not made on the basis of race.

Mr. Hobbs made another objection[1] pursuant to *Batson* during the fourth round of jury selection, following the State's use of a peremptory challenge to strike William McNeill from the jury. At the time, the State had used eight out of eleven peremptory challenges against black jurors. At that point, the trial court determined that a prima facie case had been made out by the defense. Accordingly, the trial court required the State to provide race-neutral reasons for its use of a peremptory challenge to strike juror McNeill. The trial court allowed Mr. Hobbs to respond to the State's reasons and, during argument between the parties, noted that the State had accepted eight black jurors in total and issued peremptory challenges against eight black jurors. The trial court concluded that the State's use of a peremptory challenge against juror McNeill was not based on race.

---

[1] Only those objections which Mr. Hobbs argues to this Court are detailed here.

Reviewing the decision of the trial court, the Court of Appeals held that, notwithstanding the fact that the trial court had requested race-neutral explanations for the strikes of jurors Humphrey and Layden and the fact that it made an ultimate ruling on whether the strikes were motivated by race, the question of whether Mr. Hobbs made out a prima facie case of discrimination as to jurors Humphrey and Layden was not moot. *Hobbs*, 260 N.C. App. at 404, 817 S.E.2d at 787. The Court of Appeals then concluded that Mr. Hobbs had failed to establish a prima facie case of discrimination. *Id.* at 405, 817 S.E.2d at 787–88. As to juror McNeill, the Court of Appeals affirmed the trial court's ruling that Mr. Hobbs had failed to prove racial discrimination in the State's peremptory challenge. *Id.* at 407, 817 S.E.2d at 789. Mr. Hobbs petitioned this Court for discretionary review, which we granted.

Standard of Review

Mr. Hobbs claims that the State's peremptory challenges, detailed above, were impermissibly based on the race of the jurors. The trial court has the ultimate responsibility of determining "whether the defendant has satisfied his burden of proving purposeful discrimination." *State v. Golphin*, 352 N.C. 364, 427, 533 S.E.2d 168, 211 (2000) (quoting *State v. Bonnett*, 348 N.C. 417, 433, 502 S.E.2d 563, 575 (1998)). We give this determination "great deference," overturning it only if it is clearly erroneous. *Id.* (citations omitted). Indeed, we have previously held that "[t]rial judges, who are 'experienced in supervising voir dire,' and who observe the prosecutor's questions, statements, and demeanor firsthand, are well qualified to

'decide if the circumstances concerning the prosecutor's use of peremptory challenges create[ ] a prima facie case of discrimination against black jurors.' " *State v. Chapman,* 359 N.C. 328, 339, 611 S.E.2d 794, 806 (2005) (alteration in original) (quoting *Batson,* 476 U.S. at 97, 106 S. Ct. at 1723.)  As with any other case, issues of law are reviewed de novo.  *See, e.g., State v. Parisi*, 372 N.C. 639, 649, 831 S.E.2d 236, 243 (2019) (legal conclusions " 'are reviewed de novo and are subject to full review,' with an appellate court being allowed to 'consider[ ] the matter anew and freely substitute[ ] its own judgment for that of the lower tribunal.' " (alterations in original) (quoting *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011))).

Analysis

When a defendant claims that the State has exercised its peremptory challenges in a racially discriminatory manner, a trial court conducts a three-step analysis pursuant to the decision of the Supreme Court of the United States in *Batson v. Kentucky*.  *See Snyder v. Louisiana*, 552 U.S. 472, 476–77, 128 S. Ct. 1203, 1207 (2008).

***Prima facie* case**

"[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170, 125 S. Ct. 2410, 2417 (2005); *see Batson*, 476 U.S. at 93–94, 106 S. Ct. at 1721 (stating that a defendant makes a prima facie case of discrimination "by showing that the totality of the relevant facts

- 7 -

gives rise to an inference of discriminatory purpose" (citation omitted)). "[A] prima facie showing of racial discrimination[ ] is not intended to be a high hurdle for defendants to cross. Rather, the showing need only be sufficient to shift the burden to the State to articulate race-neutral reasons for its peremptory challenge." *State v. Waring*, 364 N.C. 443, 478, 701 S.E.2d 615, 638 (2010) (quoting *State v. Hoffman*, 348 N.C. 548, 553, 500 S.E.2d 718, 722 (1998)) (alteration in original). So long as a defendant provides evidence from which the court can infer discriminatory purpose, a defendant has established a prima facie case and has thereby transferred the burden of production to the State. *See, e.g.*, *State v. Porter*, 326 N.C. 489, 497, 391 S.E.2d 144, 150 (1990) ("When a defendant makes out a prima facie case, the burden of production shifts to the State to come forward with a neutral explanation for each peremptory strike." (cleaned up)).

In making this showing, a defendant is entitled to "rely on 'all relevant circumstances' to raise an inference of purposeful discrimination." *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005) (citation omitted). Our prior cases have identified a number of factors to consider when determining whether a defendant has made out a prima facie case of discrimination, which

> include the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecution's use of a disproportionate number of peremptory challenges to

strike black jurors in a single case, and the State's acceptance rate of potential black jurors.

*State v. Quick*, 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995). These are not the only factors to consider. For example, a court must consider historical evidence of discrimination in a jurisdiction. *See, e.g., Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 346, 123 S. Ct. 1029, 1044 (2003); *see also Flowers v. Mississippi,* 139 S. Ct. 2228, 2243 (2019) (stating that a criminal defendant raising a *Batson* objection may present evidence of a "relevant history of the State's peremptory strikes in past cases" to support a claim of discrimination).

Importantly, the burden on a defendant at this stage is one of production, not of persuasion. That is, a defendant need only provide evidence supporting an inference discrimination has occurred. At the stage of presenting a prima facie case, the defendant is not required to persuade the court conclusively that discrimination has occurred. The United States Supreme Court has made this clear:

> Indeed, *Batson* held that because the petitioner had timely objected to the prosecutor's decision to strike "all black persons on the venire," the trial court was in error when it "flatly rejected the objection without requiring the prosecutor to give an explanation for his action." 476 U.S.[ ] at 100, 106 S.[ ]Ct. 1712. We did not hold that the petitioner had proved discrimination. Rather, we remanded the case for further proceedings because the trial court failed to demand an explanation from the prosecutor—i.e., to proceed to *Batson*'s second step—despite the fact that the petitioner's evidence supported *an inference* of discrimination. *Ibid.*
>
> Thus, in describing the burden-shifting framework, we assumed in *Batson* that the trial judge would have the

benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated. We did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

*Johnson*, 545 U.S. at 169–70, 125 S. Ct. at 2417. The Court then reiterated the point:

The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim. "It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."

*Johnson*, 545 U.S. at 171, 125 S. Ct. at 2417–18 (quoting *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995)).

Indeed, language in our own cases affirms this. *See, e.g.*, *Quick*, 341 N.C. at 144, 462 S.E.2d at 188 ("Therefore, to make out a prima facie case of discrimination, a defendant need only show that the relevant circumstances raise an inference that the prosecutor used peremptory challenges to remove potential jurors solely because

of their race.");[2] *Porter*, 326 N.C. at 497, 391 S.E.2d at 150 (referring to "the burden

of production" which shifts from a defendant to the State once a defendant establishes

a prima facie case).

**Race-neutral reasons**

If a defendant has made a prima facie showing, the analysis proceeds to the

second step where the State is required to provide race-neutral reasons for its use of

a peremptory challenge. *Flowers*, 139 S. Ct. at 2243.

> The State's explanation must be clear and reasonably
> specific, but does not have to rise to the level of justifying a
> challenge for cause. *See Bonnett*, 348 N.C. at 433, 502
> S.E.2d at 574; *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d
> 144, 151 (1990). Moreover, " 'unless a discriminatory
> intent is inherent in the prosecutor's explanation, the
> reason offered will be deemed race neutral.' " *Bonnett*, 348
> N.C. at 433, 502 S.E.2d at 574–75 (quoting *Hernandez*, 500
> U.S. at 360, 114 L. Ed. 2d at 406); *see also Purkett v. Elem*,
> 514 U.S. 765, 768-69, 131 L. Ed. 2d 834, 839-40, 115 S. Ct.
> 1769 (1995); *State v. Barnes*, 345 N.C. 184, 209-10, 481
> S.E.2d 44, 57, *cert. denied*, 522 U.S. 876, 118 S. Ct. 196, 139
> L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140
> L. Ed. 2d 473, 118 S. Ct. 1309 (1998). In addition, the
> second prong provides the defendant an opportunity for
> surrebuttal to show the State's explanations for the
> challenge are merely pretextual. *See State v. Gaines*, 345
> N.C. 647, 668, 483 S.E.2d 396, 408, *cert. denied*, 522 U.S.
> 900, 139 L. Ed. 2d 177, 118 S. Ct. 248 (1997); *State v.
> Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991).

---

[2] As we recognized in *State v. Waring*, this statement is incorrect to the extent that it suggests a strike is only impermissible if race is the sole reason. Instead, "the third step in a *Batson* analysis is the less stringent question whether the defendant has shown 'race was *significant* in determining who was challenged and who was not.' " *Waring*, 364 N.C. 443, 480, 701 S.E.2d 615, 639 (2010) (quoting *Miller-El II*, 545 U.S. 231, 252, 125 S. Ct. 2317, 2332 (2005)).

*Golphin*, 352 N.C. at 426, 533 S.E.2d at 211. Therefore, at *Batson*'s second step, the State offers explanations for the strike which must, on their face, be race-neutral. If they are, then the court proceeds to the third step.

**Pretext**

At the third step of the analysis, the defendant bears the burden of showing purposeful discrimination. *Waring*, 364 N.C. at 475, 701 S.E.2d at 636; *see also, State v. Wright,* 189 N.C. App. 346, 352–54, 658 S.E.2d 60, 64–65 (2008) (where the State failed to meet its burden of offering race-neutral reasons for the exercise of each of its peremptory challenges to strike black jurors, a *Batson* violation was established). "The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *Flowers*, 139 S. Ct. at 2243. At the third step, the trial court "must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race." *Id.* at 2244. "The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.'" *Id.* (quoting *Foster v. Chatman*, 136 S. Ct. 1737, 1754 (2016)).

Mr. Hobbs presents two issues for our consideration. First, Mr. Hobbs argues that the first step, whether he established a prima facie case of discrimination, became moot as to jurors Humphrey and Layden once the prosecution offered its reasons for excusing those jurors and trial court ruled on the ultimate issue of

whether the prosecutor's strikes were motivated by race. Second, he argues that the trial court erred in its ultimate determination that the State was not impermissibly motivated by race in its strikes of jurors Humphrey, Layden, and McNeill. We address each argument in turn.[3]

**Mootness**

Where the State has provided reasons for its peremptory challenges, thus moving to *Batson*'s second step, and the trial court has ruled on them, completing *Batson*'s third step, the question of whether a defendant initially established a prima facie case of discrimination becomes moot. *State v. Robinson*, 330 N.C. 1, 17, 409 S.E.2d 288, 297 (1991) ("We find it unnecessary to address the trial court's conclusion that defendant failed to make a prima facie case of discrimination because in this case the State voluntarily proffered explanations for each peremptory challenge."); *id.* at 16, 409 S.E.2d at 296–97 (stating that the trial court accepted the State's race-neutral reasons for its peremptory challenges). When the trial court has already ruled that a defendant failed in his ultimate burden of proving purposeful discrimination, there is no reason to consider whether the defendant has met the lesser burden of establishing a prima facie case of discrimination. *See Hernandez v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 1866 (1991) (plurality opinion) ("Once

---

[3] Mr. Hobbs also presented a third issue, whether the trial court and the Court of Appeals erred in their determinations that Mr. Hobbs failed to establish a *prima facie* case of discrimination as to jurors Humphrey and Layden. Because we conclude that the question is moot, we do not address this issue.

a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); *Waring*, 364 N.C. at 478, 701 S.E.2d at 638 (stating that prima facie case's purpose is to "shift the burden to the State to articulate race-neutral reasons for its peremptory challenge"). This rule is longstanding in our precedents, going back to our 1991 decision in *State v. Thomas*. 329 N.C. 423, 430–31, 407 S.E.2d 141, 147 (1991); *see also State v. Bell*, 359 N.C. 1, 12, 603 S.E.2d 93, 102 (2004); *State v. Williams* (*J. Williams*), 355 N.C. 501, 550–51, 565 S.E.2d 609, 638–39 (2002); *Robinson*, 330 N.C. at 17, 409 S.E.2d at 297.

The Court of Appeals relied on cases stating a different rule, those holding that our review is limited to whether a defendant made a prima facie showing of discrimination where the trial court has ruled on that issue but has not made an ultimate determination of whether the State's proffered reasons are actually race-neutral or pretextual. *See, e.g.*, *State v. Williams* (*J.E. Williams*), 343 N.C. 345, 359, 471 S.E.2d 379, 386–87 (1996) (holding that appellate review is limited to whether the trial court erred in finding that a defendant failed to make out a prima facie case of discrimination where the trial court so ruled, allowed the State to give reasons for the record, and did not make findings after the prosecutor gave reasons for the strikes). The Court of Appeals relied on *J.E. Williams* and *State v. Smith*, 351 N.C. 251, 262, 524 S.E.2d 28, 37 (2000), to hold that the question of whether Mr. Hobbs

- 14 -

made out a prima facie case was not moot. *Hobbs*, 260 N.C. App. at 404, 817 S.E.2d at 787. Similar to *J.E. Williams*, the trial court in *Smith* had ruled only on whether the defendant in that case had made a prima facie showing of discrimination, not whether the defendant carried the ultimate burden of persuasion. *Smith*, 351 N.C. at 262, 524 S.E.2d at 37. Accordingly, the case is distinguishable from the present case. The facts of this case are governed by the rule as stated by this Court in *Robinson* because the trial court here did consider the prosecution's race-neutral reasons for excusing jurors Humphrey and Layden, ultimately concluding that there was no racial discrimination.

Here, as in *Robinson*, we need not "examine whether defendant met his initial burden." *Robinson*, 330 N.C. at 17, 409 S.E.2d at 297. Neither *J.E. Williams* nor any of the cases relying on it provide a reason to depart from the analysis this Court provided in *Robinson*. Further, this Court has reaffirmed the rule in *Robinson* many times since it was decided. *See, e.g.*, *Bell*, 359 N.C. at 12, 603 S.E.2d at 102; *J. Williams*, 355 N.C. at 550–51, 565 S.E.2d at 638–39; *State v. Smith*, 352 N.C. 531, 540, 532 S.E.2d 773, 780 (2000); *State v. Lemons*, 348 N.C. 335, 361, 501 S.E.2d 309, 325 (1998). Accordingly, consistent with *Robinson*, we reaffirm that the question of whether a defendant has established a prima facie case of discrimination in a *Batson* challenge becomes moot after the State has provided purportedly race-neutral reasons for its peremptory challenges and those reasons are considered by the trial

court. *See Robinson*, 330 N.C. at 17, 409 S.E.2d at 297; *see also Miller-El I*, 537 U.S. at 338, 123 S. Ct. at 1040.

In urging the opposite result, the dissent ignores the fact that the trial court ruled on the ultimate question of whether Mr. Hobbs had established a *Batson* violation. Similarly, the dissent ignores our longstanding line of cases holding that, in such a circumstance, the question of whether a defendant has established a *prima facie* case is moot.

In the instant case, the State provided purportedly race-neutral reasons for its use of peremptory challenges to strike jurors Layden and Humphrey. Those reasons were considered by the trial court. As a result, the question of whether Mr. Hobbs established a *prima facie* case of discrimination as to those two jurors is moot.

**Purposeful Discrimination**

Neither the trial court nor the Court of Appeals appropriately considered all of the evidence necessary to determine whether Mr. Hobbs proved purposeful discrimination with respect to the State's peremptory challenges of jurors Humphrey, Layden, and McNeill. Accordingly, we must remand to the trial court for a new *Batson* hearing.

"A defendant may rely on 'all relevant circumstances' " to support a claim of racial discrimination in jury selection. *Flowers*, 139 S. Ct. at 2245 (quoting *Batson*, 476 U.S. at 96, 106 S. Ct. at 1723); *accord Johnson*, 545 U.S. at 170, 125 S. Ct. at 2417 ("Thus, in describing the burden-shifting framework, we assumed in *Batson* that

the trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated."). It follows, then, that when a defendant presents evidence raising an inference of discrimination, a trial court, and a reviewing appellate court, must consider that evidence in determining whether the defendant has proved purposeful discrimination in the State's use of a peremptory challenge.

A criminal defendant may rely on "a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race." *Flowers,* 139 S. Ct. 2243. This evidence includes, but is not limited to:

- statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;

- evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;

- side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

- a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

- relevant history of the State's peremptory strikes in past cases; or

- other relevant circumstances that bear upon the issue of racial discrimination.

*Id.* (citations omitted).

Here, the Court of Appeals did not consider whether Mr. Hobbs met his ultimate burden of persuasion as to potential jurors Humphrey and Layden, instead limiting its review to whether Mr. Hobbs had established a *prima facie* case of discrimination. *Hobbs*, 260 N.C. App. at 404, 817 S.E.2d at 787-88 ("Considering all the relevant factors, we conclude the trial court did not err in finding Defendant had failed to establish a prima facie showing for prospective jurors Layden and Humphrey."). However, the trial court did ultimately rule on the *Batson* challenge as to potential jurors Humphrey and Layden, concluding they were not based on race and describing itself as entering an "order in regards to the full hearing we had with regards to the *Batson* claims and challenges." Because the question of whether there was a prima facie case of discrimination was moot, the Court of Appeals should have reviewed whether the trial court properly applied the law of *Batson* and its progeny in reaching its ultimate conclusion that the prosecution did not use its peremptory challenges to excuse Layden and Humphrey from service on the jury because of their race.

In reaching its decision as to Mr. Hobbs's *Batson* challenge to the State's strikes of Mr. Layden and Mr. Humphrey, the trial court stated that it had "elected to proceed to a full hearing on the defendant's *Batson* claim." The trial court recited facts concerning the race of the victims, the race of the defendant, the race of witnesses, the number of peremptory challenges exercised by the State, and that seventy-five percent of the State's peremptory challenges removed black jurors. The

trial court also noted that Mr. Hobbs had used forty percent of his peremptory challenges to remove black jurors. The trial court then recited the reasons given by the State for its decision to excuse jurors Layden and Humphrey, as well as numerous other jurors. As to any comparison of the responses of black and white potential jurors to questioning by the prosecution, the court recited that it "further considered" Mr. Hobbs's arguments in that regard. Following this recitation of facts, the trial court stated that it had concluded "that the State's use of its peremptory challenges were not based on race nor gender, nor has there been a showing that they were based on discrimination of any constitutionally protected class."

There are three legal errors with the trial court's analysis at this point. First, in evaluating a defendant's *Batson* challenge, the peremptory challenges exercised by the defendant are not relevant to the State's motivations. *Miller-El II,* 545 U.S. at 245 n.4, 125 S. Ct. at 2328 n.4 ("[T]he underlying question is not what the defense thought about these jurors" but whether the State was using its peremptory challenges based on race.). The trial court erred by considering the peremptory challenges exercised by Mr. Hobbs.

Second, the trial court did not explain how it weighed the totality of the circumstances surrounding the prosecution's use of peremptory challenges, including the historical evidence that Mr. Hobbs brought to the trial court's attention. The dissent describes this as "a new legal standard" because the historical evidence was not "part of the argument regarding McNeill during the third stage." The trial

transcript reveals that in fact, during the argument regarding McNeill, when asked by the trial court whether there was "[a]ny other showing?" counsel for Mr. Hobbs responded: "I believe that we would stand on everything that we've earlier stated." Indeed, there is nothing new about requiring a court to consider all of the evidence before it when determining whether to sustain or overrule a *Batson* challenge. *See, e.g., Flowers v. Mississippi*, 139 S. Ct. 2228, 2245 (2019) (requiring consideration of "all relevant circumstances," including "historical evidence of the State's discriminatory peremptory strikes from past trials in the jurisdiction" in deciding a *Batson* claim); *accord Johnson v. California*, 545 U.S. 162, 170, 125 S. Ct. 2410, 2417 (2005). As the *Flowers* Court reminded us, "*Batson* did not preclude defendants from still using the same kinds of historical evidence that *Swain* had allowed defendants to use to support a claim of racial discrimination. Most importantly for present purposes, after *Batson*, the trial judge may still consider historical evidence of the State's discriminatory peremptory strikes from past trials in the jurisdiction, just as *Swain* had allowed." *Flowers*, 139 S. Ct. at 2245 (referencing *Swain v. Alabama*, 380 U. S. 202, 85 S. Ct. 824 (1965)).

Finally, the trial court misapplied *Miller-El II* by focusing only on whether the prosecution asked white and black jurors different questions, rather than also examining the comparisons in the white and black potential jurors' answers that Mr. Hobbs sought to bring to the court's attention. For example, the trial court found that "there's no evidence as to technically racially motivated questions nor does it appear

that the method of questioning was done in a discriminatory or racially motivated manner." But Mr. Hobbs argued extensively that every reason given for the State's use of a peremptory challenge against Mr. Layden and Mr. Humphrey was also found among the responses given by white jurors who were passed by the State.

As just one example, experience with mental health professionals was given as a race-neutral reason for excluding Mr. Humphrey; however, white juror Stephens was in group therapy for eight years, while white juror Williams, passed by the State, suffers from anxiety and depression and actually started crying during voir dire. Another white juror passed by the State had a granddaughter who suffered from bipolar disorder and has been an abuse victim—the juror indicated she had been very much involved in the issue with her granddaughter. We do not know from the trial court's ruling how or whether these comparisons were evaluated. Evidence about similar answers between similarly situated white and nonwhite jurors is relevant to whether the prosecution's stated reasons for exercising a peremptory challenge are mere pretext for racial discrimination. Potential jurors do not need to be identical in every regard for this to be true. *Miller-El II*, 545 U.S. at 247 n.6, 125 S. Ct. at 2329 n.6 ("A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.") "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered

at *Batson*'s third step." *Id.* at 241, 125 S. Ct. at 2325. On the ultimate question of whether the State's use of peremptory challenges to exclude jurors Layden and Humphrey was based on race, the trial court misapplied the *Batson* analysis. Thus, we remand for reconsideration of this issue.

Similar legal error occurred in the evaluation by the Court of Appeals and the trial court's evaluation of the *Batson* challenge as to potential juror McNeill, even though by that point the trial court concluded that Mr. Hobbs had established a *prima facie* case of racial discrimination in the prosecution's use of peremptory challenges. The Court of Appeals failed to conduct a comparative juror analysis, despite being presented with the argument by Mr. Hobbs. *Hobbs*, 260 N.C. App. at 407, 817 S.E.2d at 788–89.

The Court of Appeals failed to weigh all the evidence put on by Mr. Hobbs, instead basing its conclusion on the fact that the reasons articulated by the State have, in other cases, been accepted as race-neutral. *See id.* at 407, 817 S.E.2d at 789 ("As with the previous venireman, we conclude the State presented valid, race-neutral reasons for excusing prospective juror McNeill. *See Robinson*, 336 N.C. at 97, 443 S.E.2d at 314 (finding a dismissal of a juror who stated a preference of life imprisonment over the death penalty was 'clear and reasonable'); *see also State v. Maness*, 363 N.C. 261, 272, 677 S.E.2d 796, 804 (2009) (excusing a juror who had mental illness and who had worked with substance abusers, causing the State to fear she would 'overly identify with defense evidence' was valid and race-neutral)."). The

trial court similarly failed to either conduct any meaningful comparative juror analysis or to weigh any of the historical evidence of racial discrimination in jury selection presented by Mr. Hobbs. This failure was erroneous and warrants reversal. *See Flowers*, 139 S. Ct. at 2245; *Johnson*, 545 U.S. at 170, 125 S. Ct. at 2417.

On remand, considering the evidence in its totality, the trial court must consider whether the primary reason given by the State for challenging juror McNeill was pretextual. This determination must be made in light of all the circumstances, including how McNeill's responses during voir dire compare to any similarly situated white juror, the history of the use of peremptory challenges in jury selection in that county, and the fact that, at the time that the State challenged juror McNeill, the State had used eight of its eleven peremptory challenges against black potential jurors. At the same point in time, the State had used two of its peremptory challenges against white potential jurors. Similarly, the State had passed twenty out of twenty-two white potential jurors while passing only eight out of sixteen black potential jurors.

Failing to apply the correct legal standard, neither the trial court nor the Court of Appeals adequately considered all of the evidence offered by Mr. Hobbs to support his claim that certain potential jurors were excused from serving on the jury in his case on the basis of their race. Accordingly, the trial court must conduct a new hearing on these claims.

Conclusion

The Court of Appeals erred in holding that the question of whether Mr. Hobbs had established a prima facie case was not moot. Further, the Court of Appeals erred as a matter of law and the trial court clearly erred in ruling that Mr. Hobbs failed to prove purposeful discrimination with respect to the State's use of peremptory challenges to strike jurors Humphrey, Layden, and McNeill without considering all of the evidence presented by Mr. Hobbs. This error included failing to engage in a comparative juror analysis of the prospective juror's voir dire responses and failing to consider the historical evidence of discrimination that Mr. Hobbs raised. We remand for further proceedings in the trial court not inconsistent with this opinion. The trial court is instructed to conduct a *Batson* hearing consistent with this opinion, to make findings of fact and conclusions of law, and to certify its order to this Court within sixty days of the filing date of this opinion, or within such time as the current state of emergency allows. *See Hoffman*, 348 N.C. at 555, 500 S.E.2d at 723.

REVERSED AND REMANDED.

Justice NEWBY dissenting.

In this case the Court should apply our well-established deferential standard of review that allows the trial court to assess the prosecutor's demeanor and credibility and other circumstances of jury selection. Here defense counsel made several *Batson* challenges when the State exercised peremptory challenges to excuse black prospective jurors. After receiving extensive argument from the parties on the three jurors at issue here and conducting the proper analysis, the trial court concluded that defendant had not met his burden of presenting a prima facie showing of discrimination for two prospective jurors, nor had defendant met his burden to prove purposeful discrimination for a third prospective juror.

While the majority rotely recites the proper standard of review, which is highly deferential to the trial court, it then circumvents that standard by finding what it labels to be "legal errors" in the trial court's determination, thus warranting a new *Batson* hearing. The majority makes arguments not presented to the trial court or the Court of Appeals and then faults both courts for not specifically addressing them. It finds and weighs facts from a cold record. The trial court has already conducted the correct inquiry. Because the trial court's ruling, concluding that defendant neither made a prima facie showing of discrimination nor ultimately met his burden of proving purposeful discrimination, is not clearly erroneous, it should be upheld. I respectfully dissent.

*Newby, J., dissenting*

I. Facts and Procedural History

Defendant[1] concedes that he killed two people, one black and one white, and that he committed an armed robbery. On 5 November 2010 in Georgia, defendant executed Rondriako Burnett in cold blood. Burnett's body was later identified, and officers recovered a .380 caliber bullet from his body.

On 6 November 2010, defendant and his girlfriend Alexis Mattocks sat in Burnett's bloodstained, stolen SUV in the parking lot of a pawn shop in Fayetteville, North Carolina. The SUV had broken down. Defendant entered the shop to try to pawn a CD player. The pawn shop employee would not purchase the CD player because it was broken. Defendant walked outside, but later reentered the shop, asked to sell car speakers, and told Kyle Harris, a nineteen-year-old college student and employee at the pawn shop, that defendant needed help since the SUV was broken down. Harris agreed to purchase the speakers and paid defendant $50. Defendant left the pawn shop, but he and Mattocks remained at the shopping center all day with the apparent intent to later rob the store. In furtherance of this plot, they bought duct tape which they planned to use to bind the victims.

Later that evening, defendant and Mattocks entered the pawn shop to commit an armed robbery. After browsing the shop, defendant pulled out a .380 caliber

---

[1] In following this Court's 200 years of precedent, this opinion uses the term "defendant." The majority deviates from this Court's precedent by using defendant's name.

handgun and pointed it at the pawn shop employees. Defendant told the employees to empty their pockets and demanded that they hand over their valuables and empty the cash register. In abiding with defendant's direction, Harris began walking toward the cash register, at which time defendant shot Harris in the upper chest.

Defendant had also directed another employee, Derrick Blackwell, to empty the register, and had told a third employee, Sean Collins, to empty his pockets. Once Collins complied, defendant took Collins' belongings, grabbed the dying Harris's car keys from his belt loop, and exited the store. Defendant moved items from the stolen SUV to Harris's car, a silver Saturn Ion. Defendant and Mattocks then left in the Saturn. When first responders arrived on the scene, Harris was unresponsive. He later died from the gunshot wound.

On 6 November 2010, in Washington, D.C., a police officer observed a car with a North Carolina tag, learned that the vehicle was stolen, and began to pursue the vehicle. The officer conducted a traffic stop and arrested defendant. Officers thereafter learned that defendant was a "person of interest" in connection with a robbery and homicide in Fayetteville, North Carolina. After verifying that defendant was the person of interest and seeing blood on defendant's shoes and pant leg, officers obtained a search warrant for the Saturn. During the search, officers recovered a .380-caliber Lorcin handgun, which was later confirmed to match the bullets found in both Burnett's and Harris's bodies.

After obtaining the proper warrants, a detective from North Carolina traveled to Washington, D.C. to interview defendant. During the interview, defendant admitted to the robbery and said he was trying to get "[m]oney and guns." He said he had fired his weapon to "scare" the pawn shop employees but that he "wasn't trying to shoot [Harris]." Defendant was later indicted for, *inter alia*, first-degree murder, two counts of robbery with a dangerous weapon, two counts of attempted robbery with a dangerous weapon, and one count of conspiracy to commit robbery with a dangerous weapon. The State gave notice that it intended to proceed capitally. Defendant gave notice that he would assert mental infirmity, diminished capacity, and automatism defenses.

At trial there was no dispute that defendant killed Harris and committed the armed robbery since he confessed to committing both offenses. The only question at trial was defendant's culpability and his sentencing, *i.e.*, whether defendant's actions warranted capital punishment.

At defendant's trial, as is the case in all North Carolina criminal proceedings involving potential capital punishment, the State and defendant were each given fourteen peremptory challenges. *See* N.C.G.S. § 15A-1217(a) (2019). Because defendant was being tried capitally, each prospective juror had to be capitally qualified, meaning the juror would be willing to impose the death penalty if the evidence warranted such punishment. As such, proper procedure required the State to examine the prospective jurors to elicit, in part, whether they "[a]s a matter of

conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge." N.C.G.S. § 15A-1212(8) (2019). If prospective jurors testified that they would not be able to impose the death penalty, they could be removed for cause. The State and defendant could exercise a peremptory challenge for any other reason, so long as the challenge was not used for a discriminatory purpose.

During jury selection, the State exercised two peremptory challenges to excuse black prospective jurors Robert Layden and Brian Humphrey. Defense counsel then objected on *Batson* grounds. At the time defense counsel raised the *Batson* objection, the State had peremptorily challenged eight prospective jurors, six of whom were black, but had passed five black prospective jurors to defendant, equaling a 45% acceptance rate of the black prospective jurors it had questioned. Defense counsel had peremptorily challenged three white prospective jurors and two black prospective jurors, meaning it had used 40% of its peremptory challenges to strike black prospective jurors. Thus, defendant reduced the number of black prospective jurors serving on the jury.

After defense counsel raised the *Batson* objection, at defendant's request, the trial court agreed to delay argument on the *Batson* challenge until the following day. The trial court advised the parties, however, that it was inclined, "even if [it found] there's no prima facie showing[,] . . . to hear an explanation just for appellate purposes from the State."

The next morning, when presenting its argument supporting its *Batson* challenge, defense counsel stated that there had been a history of discrimination in the county, that defendant was black but the victim and most of the witnesses were white, that the challenged black prospective jurors gave answers similar to those given by the white prospective jurors that the State passed to defendant, that six of the eight peremptory challenges exercised by the State were exercised against black prospective jurors, and that the State had disproportionately struck black prospective jurors when compared to white prospective jurors.

The trial court then stated, consistent with its statement the day before, that it would give the State the opportunity to respond, not for "mutual justification or [its rebuttal]," but just to establish why defendant had "not made a prima facie case just as to those issues." Among other reasons, the State noted that defense counsel had failed to object to any of the black prospective jurors before Humphrey and Layden, who were the seventh and eighth prospective jurors challenged. The State also noted that there was both a white and a black victim in the case as well as key black witnesses.[2]

---

[2] Burnett was not the victim at issue here because he was killed in Georgia. The State, however, introduced evidence of his death for the limited, permissible purposes of showing motive, intent, and "other purposes," such as chain of circumstances as allowed by N.C.G.S. § 8C-1, Rule 404(b) (2019).

After evaluating the evidence, the trial court ruled that defendant had not made a prima facie showing of discrimination. The trial court then stated the following: "However, I want the State—for purpose[s] of the record, I will hear the State and ask the State now to show any neutral justifications for the excuse of the exercise and peremptory challenges against the African American jurors." The State then gave the following reasons for excusing Layden: (1) his sister, with whom he was very close, had significant mental health issues, including post-traumatic stress disorder (PTSD), and had experienced symptoms very similar to those claimed by defendant in his defense; (2) his reservations about the death penalty combined with his position on being a father figure to others; (3) his testimony that he favored giving people a second chance or chance for reform; (4) his statement that he was going to have to put his personal feelings aside; (5) his testimony about having reservations about the death penalty though he ultimately said he would be able to impose it; (6) his statement that he did not want to go into detail about his prior breaking or entering conviction; and (7) the fact that he did not provide information about another previous criminal charge against him. The State then gave the following reasons for excusing Humphrey: (1) he had connections and employment in the mental health field; (2) he had interacted with and had a positive opinion of mental health professionals, which the State found especially concerning since defendant planned to rely heavily on the testimony of mental health providers; (3) he had worked at a facility serving and mentoring individuals in a group home and a halfway house,

which made the State believe he would identify with defendant's life history; and (4) he had expressed a hesitancy to impose the death penalty since "he is not a killer" and said he would have sympathy for defendant.

After this challenge, the trial court ultimately reiterated its finding that defendant had not made a prima facie showing of discrimination. Regardless, after having conducted a full *Batson* hearing for the potential appellate record, the trial court concluded that the State did not use any of its peremptory challenges based on a juror's race or any discrimination against any constitutionally protected class.

Jury selection continued, and defendant later raised another *Batson* objection when the State peremptorily challenged William McNeill, another black prospective juror. At that point, the State had peremptorily challenged eight black prospective jurors and passed eight black prospective jurors to defendant, having used a total of eleven of its statutory fourteen peremptory challenges. The trial court found that when McNeill was challenged, defendant had made a prima facie showing of discrimination. The State then gave the following reasons for excusing McNeill: (1) his reservations about the death penalty; (2) the fact that he hesitated, raised his hand during questioning, and did not know how to answer the trial court's questions about imposing the death penalty; (3) his response that he was not for the death penalty though he ultimately said he could consider it; (4) his overall preference for life imprisonment without parole, which was not strong enough to justify a challenge for cause, but could warrant a peremptory challenge in the State's opinion; (5) the

fact that he had family members with substance abuse and anxiety issues; and (6) the fact that he was a pastor that participated in outreach to those going through difficult issues. In addition, the State compared McNeill to Rosas, a Hispanic prospective juror it had also peremptorily excused, who expressed similar hesitation about imposing the death penalty. Defendant countered that Rosas and McNeill did not give similar answers when asked about their opinion on the death penalty, but defendant cited no other prospective jurors the State had passed to argue that the State's reasons for excusing McNeill were pretextual.

After considering all of the evidence, including how many black prospective jurors the State had peremptorily excused versus how many it had passed to defendant, the trial court concluded that the State gave permissible, race-neutral reasons for exercising its peremptory challenge against McNeill. The trial court found persuasive that the State had also peremptorily challenged Rosas, who gave similar answers as McNeill. Thus, after concluding that defendant's constitutional rights had not been violated, the trial court ultimately denied defendant's *Batson* challenge.

The case proceeded to trial. Defendant did not testify, but various mental health experts and family members testified on his behalf. Consistent with the defenses that defendant noted he would raise, witnesses testified that defendant had a troubled childhood, was surrounded by violence and substance abuse, that his mother had abused him, and that he eventually began using drugs. The mental health experts also testified that defendant had various personality disorders and

PTSD. The mental health experts testified that defendant had told them that he was mad at Burnett and therefore wanted to kill him and that he was not remorseful for doing so. On the other hand, defendant stated that he did not intend to kill Harris.

The jury convicted defendant of all charges. As for the first-degree murder charge, the jury found defendant guilty based on theories of malice, premeditation, and deliberation, as well as under the felony murder rule based on defendant committing two counts of robbery with a dangerous weapon and two counts of attempted robbery with a dangerous weapon. Despite these findings, the jury could not unanimously agree to impose the death penalty. Defendant was sentenced to life imprisonment without parole for the first-degree murder conviction, consolidated with one attempted robbery with a dangerous weapon conviction, followed by consecutive sentences for each of the remaining convictions.

On appeal to the Court of Appeals, defendant argued, *inter alia*, that the trial court erred in concluding that defendant had not met his burden to establish a prima facie case of discrimination when the State peremptorily excused Layden and Humphrey and in concluding that defendant had not established purposeful discrimination in challenging Layden, Humphrey, and McNeill. The Court of Appeals disagreed, holding that the trial court did not err in rejecting each of defendant's *Batson* challenges. *State v. Hobbs*, 260 N.C. App. 394, 409, 817 S.E.2d 779, 790 (2018).

The Court of Appeals began by recognizing the historic, deferential standard of review in matters involving *Batson* challenges. *Id.* at 401–02, 817 S.E.2d at 785. Applying precedent from the Supreme Court of the United States and this Court, the Court of Appeals recognized that the applicable standard of review required deference to the trial court's findings; thus, the trial court's decision on a *Batson* challenge should be upheld unless an appellate court is convinced the trial court's decision is clearly erroneous. *Id.* at 401, 817 S.E.2d at 785. The Court of Appeals reiterated this Court's well-established principle that, "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id.* at 401, 817 S.E.2d at 785 (quoting *State v. Lawrence*, 352 N.C. 1, 14, 530 S.E.2d 807, 816 (2000), *cert. denied*, 531 U.S. 1083, 121 S. Ct. 789 (2001)).

Employing the well-settled standard of review, the Court of Appeals evaluated defendant's argument about the trial court's decision on the first two prospective jurors, Layden and Humphrey. *Hobbs*, 260 N.C. App. at 404, 817 S.E.2d at 787. It concluded that the question of whether defendant had established a prima facie case of purposeful discrimination was not moot as the trial court had merely asked for the State's reasoning to put on the record in case of appeal. *Id.* The Court of Appeals then concluded that, looking at all of the relevant circumstances, the trial court did not err in deciding that defendant had not established a prima facie showing of discrimination regarding prospective jurors Layden and Humphrey. *Id.* at 405, 817 S.E.2d at 787. Considering McNeill, the Court of Appeals noted the trial court's

articulated reasons for concluding that the State had provided valid, race-neutral reasons for excusing McNeill and that defendant had failed to prove any purposeful discrimination by the State. *Id.* at 407, 817 S.E.2d at 788–89. Thus, applying the appropriate deferential standard of review, the Court of Appeals upheld the trial court's decision on all grounds. *Id.* at 408–09, 817 S.E.2d at 789–90.

## II. Analysis

The essence of a *Batson* challenge is to reveal discriminatory intent by the State in excusing a prospective juror. Thus, *Batson* challenges involve credibility determinations, *i.e.*, evaluating the State's motives in exercising peremptory challenges. Given that a *Batson* challenge alleges intentional discrimination, the trial court must determine whether the State intentionally removed a prospective juror because of race. An appellate court must rely on the trial court's objective assessment of the State's motives and other circumstances. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) ("[T]he trial [court's] findings in the [*Batson*] context . . . largely will turn on evaluation of credibility." (quoting *Batson v. Kentucky*, 476 U.S. 79, 98 n.21, 106 S. Ct 1712, 1715 n.21 (1986))); *see also id.* at 2243 (stating that "the job of enforcing *Batson* rests first and foremost with trial judges" (citing *Batson*, 476 U.S. at 99 n.22, 106 S. Ct. at 1724 n.22)); *State v. Barnes*, 345 N.C. 184, 212, 481 S.E.2d 44, 59 (1997) ("It also bears repeating that jury selection is 'more art than science' and that only in the rare case 'will a single factor control the decision-making process,' as well as that a prosecutor may rely on legitimate hunches in the exercise of

peremptory challenges." (first quoting *State v. Porter*, 326 N.C. 489, 501, 391 S.E.2d 144, 152 (1990); and then citing *State v. Rouse*, 339 N.C. 59, 79, 451 S.E.2d 543, 554 (1994))). Notably, "[t]rial judges, who are 'experienced in supervising voir dire,' and who observe the prosecutor's questions, statements, and demeanor firsthand, are well qualified to 'decide if the circumstances concerning the prosecutor's use of peremptory challenges create[ ] a prima facie case of discrimination against black jurors.' " *State v. Chapman*, 359 N.C. 328, 339, 611 S.E.2d 794, 806 (2005) (alteration in original) (quoting *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723).

Because this determination involves assessing credibility, the standard of review for *Batson* challenges is well-established. A trial court's factual findings on a *Batson* determination must be upheld unless they are clearly erroneous. *Flowers*, 139 S. Ct. at 2244 ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207–08 (2008))); *State v. Taylor*, 362 N.C. 514, 527–28, 669 S.E.2d 239, 254 (2008) (stating that a trial court's findings on whether defendant has made a prima facie showing of discrimination will be upheld "unless they are clearly erroneous"); *State v. Golphin*, 352 N.C. 364, 427, 533 S.E.2d 168, 211 (2000) (recognizing that a trial court's determination on the third prong of *Batson*—whether defendant has met his burden to show that the State purposefully discriminated in exercising peremptory challenges—should be upheld "unless we are

convinced it is clearly erroneous" (citing *State v. Kandies*, 342 N.C. 419, 434–35, 467 S.E.2d 67, 75, *cert. denied*, 519 U.S. 894, 117 S. Ct. 237 (1996))).

While reciting the correct deferential standard of review, the majority fails to apply it. The majority circumvents the deferential standard of review by characterizing its criticism of the trial court as "legal errors." In doing so, it devalues the significant institutional advantages of the trial court including the ability to have face-to-face interaction with the parties, to observe an individual's demeanor, and to make credibility determinations based on the parties' non-verbal communication cues accompanying its arguments. Given these advantages, the trial court is best suited to assess the use of each peremptory challenge. This is particularly true in that we have recognized that jury selection "is 'more art than science' and that . . . a prosecutor may rely on legitimate hunches in the exercise of peremptory challenges." *Barnes*, 345 N.C. at 212, 481 S.E.2d at 59. It appears that the majority is again placing itself in the role of fact-finder, usurping the role of the trial court. *See State v. Reed*, 838 S.E.2d 414, 429 (N.C. 2020) (Newby, J., dissenting) ("An appellate court must determine whether the trial court's findings of fact are supported by competent evidence and whether those findings support the trial court's conclusions of law. Instead, on a cold record the majority reweighs the evidence and makes its own credibility determinations in finding facts." (citing *State v. Williams*, 366 N.C. 110, 114, 726 S.E.2d 161, 165 (2012))); *State v. Terrell*, 372 N.C. 657, 674, 831 S.E.2d 17, 28 (2019) (Newby, J., dissenting) ("In addition, to reach its result, the majority

violates the standard of review by rejecting facts found by the trial court, which are supported by substantial evidence, and substitutes its own fact-finding."); *State v. Grady*, 372 N.C. 509, 552, 831 S.E.2d 542, 573 (2019) (Newby, J., dissenting) ("[The majority] rejects the facts found by the trial court and finds its own.").

There are two types of challenges that attorneys may use to challenge or excuse certain prospective jurors. *Flowers*, 139 S. Ct. at 2238. First, an attorney may exercise a for-cause challenge, "which usually stems from a potential juror's conflicts of interest or inability to be impartial." *Id.* In North Carolina, a prospective juror may be challenged for cause for, *inter alia*, being "unable to render a verdict with respect to the charge in accordance with" North Carolina law. N.C.G.S. § 15A-1212(8) (2019).

The second type of challenge that attorneys may exercise is a peremptory challenge. Though not a constitutionally recognized principle, "[p]eremptory strikes have very old credentials and can be traced back to the common law." *Flowers*, 139 S. Ct. at 2238. "[P]eremptory strikes traditionally may be used to remove any potential juror for any reason—no questions asked." *Id.*

The Equal Protection Clause prevents discrimination, however, and thus can conflict with an attorney's ability to exercise peremptory challenges for any reason. *Id.* Accordingly, the Supreme Court of the United States recognized limitations on peremptory challenges to ensure that strikes are not used for a discriminatory purpose against a protected class. Thus, in *Batson*, the Supreme Court of the United

States set forth a three-prong test to determine whether a prosecutor improperly dismissed a prospective juror based on that juror's race. This Court expressly "adopted the *Batson* test for review of peremptory challenges under the North Carolina Constitution." *State v. Fair*, 354 N.C. 131, 140, 557 S.E.2d 500, 509 (2001) (citing *Lawrence*, 352 N.C. at 13, 530 S.E.2d at 815; *State v. Mitchell*, 321 N.C. 650, 365 S.E.2d 554 (1988)); *see* N.C. Const. art. I, § 26.

"First, the defendant must make a prima facie showing that the state exercised a peremptory challenge on the basis of race." *Fair*, 354 N.C. at 140, 557 S.E.2d at 509. "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial [court] to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170, 125 S. Ct. 2410, 2417 (2005). Nonetheless, this step is important in minimizing disruption in the jury selection process, limiting the number of trials within trials that occur within *Batson* hearings. *See generally id.* at 172–73, 125 S. Ct. at 2418–19 (noting that the Batson framework "encourages 'prompt rulings on objections to peremptory challenges without substantial disruption to the jury selection process'" (quoting *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S. Ct. 1859, 1865–66 (1991) (plurality opinion))). Several factors are relevant in informing the trial court as to whether the defendant has carried his burden to show an inference of discrimination:

> Those factors include the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or

> refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecution's use of a disproportionate number of peremptory challenges to strike black jurors in a single case, and the State's acceptance rate of potential black jurors.

*State v. Quick*, 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995).

"Once a defendant has made a prima facie case, the burden of production shifts to the prosecutor to come forward with race-neutral explanations for the peremptory challenges." *Id.* at 144, 462 S.E.2d at 188. "[T]he 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Johnson*, 545 U.S. at 168, 125 S. Ct. at 2416 (quoting *Batson*, 476 U.S. at 94, 106 S. Ct. at 1721). Notably, "the law 'does not demand [a race-neutral] explanation that is persuasive, or even plausible. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Quick*, 341 N.C. at 144–45, 462 S.E.2d at 188 (alteration in original) (quoting *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S. Ct. 1769, 1770–71 (1995)). "[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723 (citing *McCray v. Abrams*, 750 F.2d 1113, 1132 (2d Cir. 1984), *cert. granted, judgment vacated by* Abrams v. McCray, 478 U.S. 1001, 106 S. Ct. 3289 (1986); *Booker v. Jabe*, 775 F.2d

762, 773 (6th Cir. 1985), *cert. granted, judgment vacated by Michigan v. Booker*, 478 U.S. 1001, 106 S. Ct. 3289 (1986)).

> The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim. 'It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.'

*Johnson*, 545 U.S. at 171, 125 S. Ct. at 2418 (quoting *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771). Thus, "'[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Purkett*, 514 U.S. at 767, 115 S. Ct. at 1770–71 (citing *Hernandez*, 500 U.S. at 358–59, 111 S. Ct. at 1865–66; *id.* at 375, 111 S. Ct. at 1874 (O'Connor, J., concurring in judgment); *Batson*, 476 U.S. at 96–98, 106 S. Ct. at 1722–23). "The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.'" *Flowers*, 139 S. Ct. at 2244 (quoting *Foster v. Chatman*, 136 S. Ct. 1737, 1754 (1996)). Thus, "[s]tep three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.'" *Snyder*, 552 U.S. at 477, 128 S. Ct. at 1208 (second alteration in original) (first citing *Batson*, 476 U.S. at 98 n.21, 106 S. Ct. at 1724 n.21; and then quoting *Hernandez*, 500 U.S. at 365, 111 S. Ct. at 1869).

a. Mootness

Here defendant argues, and the majority agrees, that the question of whether defendant established a prima facie case of discrimination became moot when, at the trial court's request, the State offered its reasoning for challenging Layden and Humphrey.

"Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359, 111 S. Ct. at 1869. "If the prosecutor volunteers his reasons for the peremptory challenges in question before the trial court rules whether the defendant has made a prima facie showing or if the trial court requires the prosecutor to give his reasons without ruling on the question of a prima facie showing, the question of whether the defendant has made a prima facie showing becomes moot." *State v. Williams*, 343 N.C. 345, 359, 471 S.E.2d 379, 386 (1996) (citing *Hernandez*, 500 U.S. at 359, 111. S. Ct. at 1866; *State v. Robinson*, 336 N.C. 78, 93, 443 S.E.2d 306, 312 (1994), *superseded by statute on other grounds as stated in Cummings v. Ortega*, 365 N.C. 262, 716 S.E.2d 235 (2011)).

When a trial court asks for the State's reasoning for using peremptory challenges *after* making a ruling that the defendant has not met his initial burden of showing an inference of prima facie discrimination, however, the question of whether

the defendant has made a prima facie showing is not moot. *See id.* If the trial court asks for the State's reasons after a defendant requests them to be stated for the record, for example, the first step of the *Batson* inquiry is not moot. *See id.*; *see also State v. Smith*, 351 N.C. 251, 262, 524 S.E.2d 28, 37 (2000) ("In the instant case, the trial court concluded that defendant had not made a prima facie showing that the peremptory challenge was exercised on the basis of race, but the trial court permitted the State to make any comments for the record that it chose to make. When the trial court rules that a defendant has failed to make a prima facie showing, our review is limited to whether the trial court erred in finding that defendant failed to make a prima facie showing even if the State offers reasons for its exercise of the peremptory challenges." (citing *State v. Hoffman*, 348 N.C. 548, 554, 500 S.E.2d 718, 722–23 (1998))).

Here the trial court explicitly stated that it was inclined, "even if [it found] there's no prima facie showing on any case[,] . . . to hear an explanation just for appellate purposes from the State." Thus, even though the trial court asked for and the State presented reasons why defendant had not made a prima facie case, the trial court made clear that it was only for the purpose of preserving the record and not for consideration for its decision. Moreover, the trial court asked for the State's reasons justifying its use of the peremptory challenges only after the trial court had ruled that defendant had not made a prima facie showing of discrimination. Because the trial court explicitly stated that it was asking for the State's reasoning solely for the

purpose of preserving the record, the question of whether defendant presented a prima facie case is not moot. *See Williams*, 343 N.C. at 359, 471 S.E.2d at 386. The trial court appropriately recognized that its *Batson* ruling would be subject to appellate review given the serious charges and resulting lengthy trial, and therefore attempted to provide a complete record. The majority's holding will eliminate this practice.

## b. Humphrey and Layden

Since the first step prima facie question is not moot, and recognizing the extremely deferential standard of review, it cannot be said that the trial court clearly erred in determining that defendant did not establish a prima facie case of discrimination. Among other things, the trial court considered the State's demeanor when responding to defense counsel, the questions that the State asked the black prospective jurors, and that the State had passed five of the black prospective jurors that were not excused for cause. *See Quick*, 341 N.C. at 145, 462 S.E.2d at 189. Because the trial court considered the correct factors and reached a reasoned, factually supported conclusion, and given the deference afforded to the trial court, the trial court's decision here cannot be deemed clearly erroneous.

Nonetheless, even if the trial court should have proceeded to the second and third *Batson* stages, the trial court did not clearly err in determining for the record that the State offered permissible, race-neutral reasons for exercising peremptory

challenges to excuse Layden and Humphrey. After hearing extensive argument, the trial court made comprehensive findings in which it considered the race of defendant, the victim, and the witnesses. The trial court evaluated the way the State questioned the black prospective jurors versus the way it questioned white prospective jurors, concluding that the State had not questioned any jurors in a discriminatory manner. The trial court recounted the relevant statistics, noting that the State had passed 45% of black prospective jurors and that the State had struck two white prospective jurors. The trial court recounted and found convincing the State's reasons for excusing Layden and Humphrey, including their mental health history, connections, equivocation on the death penalty, and other life history. Those factors directly related to the defense that defendant planned to assert at trial as well as to the potential capital punishment at issue. The trial court also considered the prospective jurors that the State had passed to defendant versus those it had peremptorily excused. Thus, the trial court's decision that the prosecutor had acted with discriminatory intent in removing Layden and Humphrey was supported by the evidence and the testimony and cannot be deemed clearly erroneous.

### c. McNeill

With the challenge to McNeill, the trial court found that defendant had presented a prima facie case of discrimination. The trial court then conducted a full *Batson* hearing. At the third stage, the trial court considered all of the evidence presented and arguments made, and ultimately determined defendant had not

proven that the State purposefully discriminated in peremptorily challenging McNeill. The burden of proof was on defendant to prove discriminatory intent. In making its decision, the trial court made the following findings: (1) the State had exercised eight of its peremptory challenges to excuse black prospective jurors and passed the same number of black prospective jurors to defendant; (2) when asked whether he could impose the death penalty, McNeill had equivocated on his responses and expressed a general preference for a sentence of life imprisonment without parole; (3) McNeill had family members with anxiety issues; (4) that in his position as a pastor, McNeill dealt with individuals who had drug problems; and (5) when compared with Rosas, who the State also excused, both McNeill and Rosas expressed hesitancy about imposing the death penalty. Significantly, the only specific prospective juror comparison that defendant argued to the trial court was that of McNeill to Rosas.

These race-neutral reasons found by the trial court have a direct bearing on the issues presented in this case and McNeill's duties as a prospective juror. While McNeill's equivocation about the death penalty may not have risen to a level sufficient for the State to challenge him for cause, McNeill's reservations on the death penalty relate to an essential part of the case. Moreover, given defendant's extensive mental health and substance abuse concerns presented in detail at trial, certainly the trial court did not clearly err by determining that these types of connections, especially that McNeill worked directly with individuals with similar concerns as

defendant, fairly informed the State's decision to exercise a peremptory challenge. Thus, the trial court appropriately considered the evidence and arguments presented to it and held that the State did not intentionally discriminate in exercising a peremptory challenge to remove McNeill from the jury. Applying the correct standard of review, the trial court's decision to reject defendant's *Batson* challenge of McNeill was not clearly erroneous.

In order to justify its remand, the majority recites what it characterizes as "three legal errors" committed by the trial court. First, it holds that "in evaluating the defendant's *Batson* challenge, the number of peremptory challenges exercised by the defendant are not relevant to the State's motivations." That is not true. When considering the totality of the circumstances, the ultimate racial composition of the jury is directly impacted by the defendant's exercise of peremptory challenges to excuse minority prospective jurors.

Second, the majority says the trial court erred because it "did not explain how it weighed the totality of the circumstances surrounding the prosecutor's use of peremptory challenges, including the historical evidence that [defendant] brought to the trial court's attention." However, the trial court thoroughly evaluated all of the evidence presented and each of defendant's arguments and set forth its reasons in finding that there was no racial discrimination by the State. Notably, the historical evidence was argued by defendant at the prima facie showing phase regarding the first two jurors. It was not part of the argument regarding McNeill during the third

stage. The majority creates a new legal standard by requiring the trial court to explain how it weighed an argument that was not presented.

Third, the majority holds "the trial court misapplied *Miller-El II* by focusing only on whether the prosecution asked white and black jurors different questions, rather than also examining the comparisons in the white and black potential jurors' answers that [defendant] sought to bring to the court's attention." With this holding, the majority finds that the trial court and the Court of Appeals erred by not addressing arguments that defendant failed to present to them. The comparison to Stephens presented by the majority was not presented to the trial court or the Court of Appeals. The majority says that the Court of Appeals "failed to conduct a comparative juror analysis, despite being presented with the argument by" defendant. Notably, the entirety of defendant's comparative juror analysis at the Court of Appeals was as follows: the "circumstances the State said were reasons for striking African-American jurors also fit white jurors the State accepted as jurors." Defendant carries the burden of making arguments to the trial court and the appellate courts, and he advanced no argument about any specific comparative juror analysis to the either court. It is not the role of the appellate court to peruse the trial transcript and formulate new arguments for defendant that he did not make at trial or on appeal. The majority cannot realistically say that the trial court or the Court of Appeals should have addressed factually specific arguments that defendant himself did not make.

Importantly, the standard of review for reviewing *Batson* challenges is whether the trial court's decision was clearly erroneous. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Lawrence*, 352 N.C. at 14, 530 S.E.2d at 816 (quoting *State v. Thomas*, 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991)). This Court is not a trial court. It should not make factual determinations based on a cold record. Furthermore, it should not create arguments not presented to the trial court or the Court of Appeals. The trial court did not clearly err by determining that defendant had not shown that the State purposefully discriminated in exercising its peremptory challenges. As such, the trial court's determination as to those prospective jurors should be upheld. Therefore, I respectfully dissent.